# United States Court of Appeals for the Federal Circuit

---

**UNITED STATES CAPITOL POLICE,**
*Petitioner*

**v.**

**OFFICE OF CONGRESSIONAL WORKPLACE RIGHTS,**
*Cross-Applicant*

**FRATERNAL ORDER OF POLICE, UNITED STATES CAPITOL POLICE LABOR COMMITTEE,**
*Intervenor*

---

2022-1983, 2022-2222

---

Petition for review and cross-application for enforcement of a decision of the Board of Directors of the Office of Congressional Workplace Rights in No. 20-LMR-01 (CA).

---

Decided: July 31, 2024

---

PAUL FRANCIS ENZINNA, Ellerman Enzinna Levy PLLC, Washington, DC, argued for petitioner. Also represented by MICHAEL NATHANIEL LEVY; KELLY MARISSA SCINDIAN, Office of Employment Counsel, United States Capitol Police, Washington, DC.

JOHN MICKLEY, Office of Congressional Workplace

Rights, Washington, DC, argued for cross-applicant. Also represented by JOHN D. UELMEN.

MEGAN KATHLEEN MECHAK, McGillivary Steele Elkin LLP, Washington, DC, argued for intervenor.

————————————

Before PROST, HUGHES, and STOLL, *Circuit Judges*.

HUGHES, *Circuit Judge*.

The United States Capitol Police appeals the Office of Congressional Workplace Rights Board of Directors' decision holding, on summary judgment, that the United States Capitol Police had committed an unfair labor practice. The Fraternal Order of Police, United States Capitol Police Labor Committee intervened. Because there are genuine issues of material fact regarding notice, we reverse the grant of summary judgment and remand for further proceedings.

I

We begin by explaining the applicable legal framework before turning to the facts and procedural history of this appeal.

A

The Congressional Accountability Act of 1995 (CAA) (codified at 2 U.S.C. §§ 1301–1438) provides "certain legislative branch employees with some of the same collective bargaining rights as those enjoyed under other statutes by certain executive branch employees." *U.S. Capitol Police v. Off. of Compliance*, 908 F.3d 776, 781 (Fed. Cir. 2018). The CAA accomplishes this by incorporating many provisions of the Federal Service Labor-Management Relations Statute (FSLMRS) (codified at 5 U.S.C. §§ 7101–35).

"The [FSLMRS] requires agencies to bargain in good faith with their employees' recognized representative

regarding 'conditions of employment,' . . . which include 'personnel policies, practices, and matters, whether established by rule, regulation, or otherwise, affecting working conditions,' . . . ." *Nat'l Treasury Emps. Union v. FLRA*, 745 F.3d 1219, 1221 (D.C. Cir. 2014) (citing 5 U.S.C. §§ 7101(2); 7103(a)(12), (14); 7114(a)(4), (b)). The Federal Labor Relations Authority (FLRA) has understood the good-faith bargaining requirement to require an agency to provide its employees with "notice of the change and an opportunity to bargain over those aspects of the change that are within the duty to bargain" unless the change will only have a de minimis effect on the condition of employment. *Id.* (quoting *U.S. Dep't of Air Force, Air Force Material Command, Space & Missile Sys. Ctr., Detachment 12, Kirtland Air Force Base, N.M.*, 64 F.L.R.A. 166, 173 (2009)).

Under 5 U.S.C. § 7106(a), an agency has certain statutory management rights, subject to the limitations in subsection (b). *See, e.g.*, *U.S. Capitol Police*, 908 F.3d at 782. An agency generally has "the right to control its internal organization, the number of employees, and work assignments . . . ." *Nat'l Treasury Emps. Union*, 745 F.3d at 1221. An agency also has the right "to take whatever actions may be necessary to carry out the agency mission during emergencies." 5 U.S.C. § 7106(a)(2)(D). An agency is not required to bargain over its exercise of its management rights. *See Nat'l Ass'n of Gov't Emps., Local R5-136 v. FLRA*, 363 F.3d 468, 471–72 (D.C. Cir. 2004) (interpreting FSLMRS). Nonetheless, labor organizations can negotiate, for example, "procedures which management officials of the agency will observe in exercising any authority under this section" and "appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials." 5 U.S.C. § 7106(b). This is referred to as "impact and implementation" bargaining. *See Nat'l Treasury Emps. Union v. FLRA*, 414 F.3d 50, 53 (D.C. Cir. 2005). Therefore, "[a]lthough an agency is not required to bargain over its management

rights, . . . it must negotiate about the impact and implementation of its exercise of those rights." *Nat'l Treasury Emps. Union*, 745 F.3d at 1221.

An agency that does not comply with applicable bargaining procedures may have committed an unfair labor practice in violation of the FSLMRS. Section 7116 of the FSLMRS lists unfair labor practices. *See* 5 U.S.C. § 7116(a). In particular, an agency commits an unfair labor practice where it: "(1) . . . interfere[s] with, restrain[s], or coerce[s] any employee in the exercise by the employee of any right under this chapter; . . . (5) . . . refuse[s] to consult or negotiate in good faith with a labor organization as required by this chapter; [or] . . . (8) . . . otherwise fail[s] or refuse[s] to comply with any provision of this chapter." *Id.*

B

The United States Capitol Police (USCP) is a legislative-branch law enforcement agency, subject to the CAA, charged with "secur[ing] and protect[ing] the Congress and the U.S. Capitol 24 hours a day, 365 days a year to ensure the continuity of our representational government." J.A. 457; *see also* 2 U.S.C. § 1901. The USCP's officers are represented by the Fraternal Order of Police, District of Columbia Lodge No. 1 (Union), pursuant to a collective bargaining agreement (CBA). J.A. 3; J.A. 49–152 (copy of the CBA).

Subsection 8.02 of the CBA addresses procedures for bargaining over the impact and implementation of any departmental change in conditions of employment. J.A. 71. In particular, the USCP must "notify the Union's Chairman or other designated representative of the proposed or anticipated change, in writing and as far in advance as possible, but generally not later than twenty-one (21) days before implementation." J.A. 71. Then, if the Union "wishes to negotiate on the decision," it has fourteen days to inform the USCP and "disclose its specific proposals for negotiation to the proposed changes." J.A. 71. Then, the Union and

the USCP will "meet to negotiate on negotiable aspects of the Union's proposal," and once an agreement is reached "on any impact and implementation aspects of the decision, the Department will implement the change in accordance with the terms agreed upon." J.A. 71. If the parties do not come to an agreement, Subsection 8.03 provides for further procedures. J.A. 72.

1

On March 20, 2020, faced with the COVID-19 pandemic, USCP Chief of Police Steven Sund notified Union Chairman Gus Papathanasiou that the USCP was suspending the CBA under Article 8, Subsection 8.04, and 5 U.S.C. § 7106(a)(2)(D), effective immediately.[1] J.A. 3–4. Mr. Papathanasiou, while recognizing that "the present circumstances are 'exceptional,'" expressed the Union's disagreement with the Chief of Police's decision. J.A. 4. The Union disputed the USCP's authority to unilaterally suspend the entire CBA under Subsection 8.04 of the CBA and 5 U.S.C. § 7106(a)(2)(D). *See* J.A. 687–88; *see also* J.A. 8–9. The Union maintained that Subsection 8.02 provided that in the case of "exceptional or unforeseen circumstances," the 21-day notice requirement may be shortened, and this would be sufficient for the USCP to respond to the pandemic. J.A. 453. Nonetheless, the USCP suspended the entire CBA until July 15, 2020, when "the USCP sent a letter to the [Union] advising that it was reinstating certain

---

[1]    Subsection 8.04 of the CBA, titled "Suspension of Provision(s) of the Agreement," allows the Chief of Police to "suspend temporarily the implementation of provisions of the [CBA] that would prevent or impede accomplishment of the [USCP's] mission" during an emergency. J.A. 263. "Emergency situations include, but are not limited to, riots, demonstrations, fires, floods and other disasters/events." J.A. 72.

articles of the CBA." J.A. 5–6. Other articles were reinstated at different points over the following months. *See* J.A. 6.[2]

2

While the CBA was suspended, the USCP "evaluate[d] far reaching changes to its operations and administrative support" in response to the COVID-19 pandemic. J.A. 444 (¶ 10). The USCP, in making these changes, sought to "lessen the likelihood that employees would contract COVID-19 in the workplace by mandating social distancing," ensuring that employees who may have COVID-19 were "kept out of the workplace," suspending any activities or the use of any facilities that may "increase the risk of exposure to the virus," providing its employees "timely and accurate information" about, among other things, "changes to the Department's operations or administrative functions," furnishing employees with the necessary supplies and protective equipment, and conducting certain activities remotely. J.A. 444–45 (¶¶ 10–15).

These measures were outlined in a May 7, 2020, letter to Congressman Steny H. Hoyer, referred to as the "Hoyer Letter." J.A. 445 (¶ 16); J.A. 165–73 (copy of the Hoyer Letter). In that letter, the USCP explained that it "has implemented a comprehensive and aggressive COVID-19 response plan that affects nearly every aspect of the [USCP's] operations, administrative functions, safety protocols, and facilities management." J.A. 165. The letter goes on to list several pages of changes in a bulleted list, describing them as "some, but not all, of the significant changes the [USCP] implemented." J.A. 165–69. Later in

---

[2] All provisions of the CBA were reinstated by April 2021. *See* Oral Arg. at 49:41–52, available at https://oralarguments.cafc.uscourts.gov/default.aspx?fl=22-1983_03052024.mp3.

the Hoyer Letter, the USCP recognized its obligation under the CBA to notify the Union of changes in working conditions and accepted that "[m]ost of the changes described [in the bulleted list] likely are changes in working conditions." J.A. 170.

In the Hoyer Letter, the USCP explained that suspending the entire CBA, including the notice provisions, allowed it to quickly adapt its operations in view of the ongoing pandemic. *See* J.A. 170 ("In a pandemic situation when individuals may become symptomatic after 14 days, the Department cannot wait months, or longer, to implement changes intended to maintain the health of its workforce.").

3

The Union alleges it did not receive a copy of the Hoyer Letter or otherwise have notice of the changes detailed in the letter until early May 2020. *See, e.g.*, Cross-Applicant's Br. 22–25; J.A. 401–02 (¶ 7). The Union did not formally receive a copy of the letter from the USCP until June 8, 2020. J.A. 401–02 (¶ 7).

By contrast, after the CBA was suspended, Mr. Sund attested that he "had email, telephone, and text communications with [Union] executive board members, including Chairman Papathanasiou, and Vice Chairmans Keith McFaden and Vincent Summers" "[n]early every day." J.A. 445 (¶ 17). Therefore, according to the USCP, the Union had notice of the changes outlined in the Hoyer Letter. *See* J.A. 445 (¶ 17) ("These communications concerned many of the changes the [USCP] implemented as well as Union suggestions of steps the [USCP] could take."); *see also* J.A. 447 (¶ 22). While the CBA was suspended in early 2020, Mr. Sund "received only two communications from the Union regarding specific proposals submitted in response to changes in condition of bargaining unit members' employment," one of which Mr. Sund agreed to, and the other which was denied "because the proposals were not negotiable." J.A. 446–47 (¶¶ 18–21). The USCP maintains that

this shows that the Union did have sufficient notice. *See, e.g.*, Pet'r's Reply Br. 2 n.2.

C

Three days after the USCP notified the Union that the CBA was suspended, on March 23, 2020, the Union filed an unfair labor practice charge with the Office of Congressional Workplace Rights' General Counsel (General Counsel). J.A. 4. The Union alleged that the USCP violated § 7116(a)(1), (5), and (8) of the FSLMRS when it "failed to provide proper notice, failed to negotiate the USCP's emergency response plan to COVID-19, and unilaterally suspended the entire CBA." J.A. 4; *see also* J.A. 21–22 (¶ 7).

In November 2020, the General Counsel filed a complaint against the USCP, alleging the USCP committed unfair labor practices in responding to the COVID-19 pandemic. J.A. 20–30 (Complaint); *see also* J.A. 6. After a pretrial conference, the Office of Congressional Workplace Rights (OCWR) hearing officer "determined that no genuine issue exists as to any material fact in this case" and directed the parties to file cross-motions for summary judgment. J.A. 193–94.

On January 29, 2021, the hearing officer granted summary judgment for the General Counsel and the Union and denied the USCP's cross-motion for summary judgment. J.A. 696–97 (hearing officer decision). The hearing officer held that the USCP committed unfair labor practices in violation of § 7116(a)(1), (5), and (8). J.A. 697 (¶¶ 2–4). Particularly, the USCP committed an unfair labor practice when it (1) suspended the entire CBA; (2) did not reinstate provisions of the CBA that "did not interfere with carrying out its mission"; and (3) did not bargain with the Union "over changes to conditions of employment that it unilaterally implemented after suspending the parties' CBA." J.A. 697 (¶¶ 2–4). In addition, the hearing officer concluded that the USCP committed an unfair labor practice in violation of § 7116(a)(1) and (8) "when it suspended and refused

to reinstate the grievance and arbitration provisions contained in Article 32 of the parties' CBA . . . ." J.A. 697 (¶ 5). The hearing officer thereafter ordered the USCP to "cease and desist and to take certain affirmative action designed to effectuate the policies of the CAA." J.A. 698–99.

## D

The USCP appealed to the OCWR Board of Directors (Board). *See* J.A. 2–19. On April 4, 2022, the Board affirmed in part the portion of the hearing officer's decision finding "that the USCP committed an unfair labor practice when it failed to engage in good faith bargaining after its suspension of the CBA." J.A. 7–8. The Board concluded that "the undisputed record establishes that the USCP failed to give the Union specific and definitive notice of the USCP's unilateral changes in conditions of employment implemented as part of its COVID-19 response plan, including the scope and nature of those changes and the certainty and timing of those changes . . . ." J.A. 13, 15. Since the Board concluded that its determination that the USCP failed to give sufficient notice was "adequate to sustain the [h]earing [o]fficer's conclusion that the USCP violated the FSLMRS," the Board did "not reach the [h]earing [o]fficer's" additional "grounds for reaching this conclusion." J.A. 13–14. The Board adopted the hearing officer's "findings and conclusions only to the extent consistent with this Decision." J.A. 13–14. The Board also sustained the hearing officer's order on remedial action. J.A. 14–15.

## E

The USCP timely filed the present appeal. We have jurisdiction over any proceeding commenced under 2 U.S.C. § 1351(c)(3) by the General Counsel and may "set aside, suspend (in whole or in part), . . . determine the validity of, or otherwise review the decision of the Board." 2 U.S.C. § 1407(a)(1)(D).

## II

Motions for summary judgment before the OCWR are governed by the same requirements as motions for summary judgment under Federal Rule of Civil Procedure 56. *See Dep't of V.A., V.A. Med. Ctr., Nashville, Tenn., AFGE Local 2400*, 50 F.L.R.A. 220, 222 (1995); OCWR Proc. Rules § 5.03(d). Therefore, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

We review the Board's grant of summary judgment de novo. *Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003) ("Summary judgment, however, is, of course, in all respects reviewed *de novo*."); *see also Leggett v. Off. of Cong. Workplace Rts.*, 2023 WL 1459276, at *1 n.1 (Fed. Cir. Feb. 2, 2023) (reviewing Board's grant of summary judgment de novo). When evaluating whether a movant is entitled to summary judgment, we "believe[]" the evidence of the non-movant and draw "all justifiable inferences" in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III

On appeal, the USCP argues that the General Counsel and the Union failed to prove they were entitled to summary judgment, *see, e.g.*, Pet'r's Br. 18, 30–31, and asks us to "set aside the Board's decision," Pet'r's Br. 31; *see also* Pet'r's Reply Br. 14 (same). The General Counsel and the Union defend the Board's decision and ask us to enforce the Board's remedial order. Cross-Applicant's Br. 37–39; Intervenor's Br. 19. Reviewing de novo, we conclude that genuine issues of material fact preclude the grant of summary judgment in the General Counsel and Union's favor because they have not established that the USCP failed to bargain in good faith with the Union over any changes in conditions of employment listed in the Hoyer Letter.

We begin by agreeing with the USCP that the Board erred in granting the General Counsel and the Union's motions for summary judgment without deciding which changes, listed in the Hoyer Letter, were changes in conditions of employment. Without a determination of which changes were changes in conditions of employment subject to bargaining and when those changes were made, we cannot evaluate whether notice of that change was necessary, and if so, whether the Union was provided with adequate notice. The Board merely listed the changes at the end of its decision, describing them as "35 items regarding operational changes impacting bargaining unit employees."[3] J.A. 5, 11, 16–19. And as discussed at oral argument, not all of the changes seem to be properly considered as changes in conditions of employment. *See* Oral Arg. at 35:06–40:14 (General Counsel), 58:36–59:27 (USCP). For example, "develop[ing] enhanced cleaning schedules for . . . facilities[] . . . most frequented by [USCP] officers," is not obviously a change in the conditions of employment. J.A. 168. Reviewing de novo, and drawing all inferences in the USCP's favor, as we must, there are genuine disputes of material fact regarding which changes, if any, triggered the USCP's duty to bargain in good faith.

Turning to notice, the USCP argues that the General Counsel and the Union failed to meet their burden on summary judgment to show that the Union had no notice of the changes described in the Hoyer Letter. *See, e.g.*, Pet'r's Br.

---

[3]   While the Board characterized the Hoyer Letter's statement that "[m]ost of the changes described . . . likely are changes in working conditions" (J.A. 462) as an admission, *see* J.A. 5, we disagree that the USCP has admitted this fact. On summary judgment, we must make all reasonable inferences in the USCP's favor, and as the USCP argues, at least some changes listed do not appear, on this record, to be changes in conditions of employment.

19–23; Pet'r's Reply Br. 3–6. The General Counsel and the Union respond that the Union never received adequate notice of the changes in conditions of employment and argue that the USCP has failed to bring forth affirmative evidence to support its position. *See, e.g.*, Cross-Applicant's Br. 18–21, 26–32; Intervenor's Br. 12–14. Here, too, there are genuine issues of material fact regarding whether the Union received notice of any changes in conditions of employment and had an opportunity to bargain over any aspects of the change that are "within the duty to bargain." *See Nat'l Treasury Emps. Union*, 745 F.3d at 1221 (citation omitted).

Generally, notice must be provided "prior to implementing a change in conditions of employment." *See id.* (citation omitted). However, where an agency is forced to act during an emergency, the FLRA has determined that post-implementation notice can be sufficient. *See Dep't of Homeland Sec. Border & Transp. Directorate, Nat'l Treasury Emps. Union*, 61 F.L.R.A. 272, 292 (2005) ("Requiring pre-implementation bargaining would effectively nullify section 7106(a)(2)(D) with respect to emergencies that could not be anticipated in advance.").

Here, while there is evidence that the Union did not receive the Hoyer Letter and the list of changes it details until May 7, 2020, *see* J.A. 401 (¶ 7), there is also evidence indicating that the USCP and the Union regularly communicated about the USCP's COVID-19 response, *see, e.g.*, J.A. 169; J.A. 445 (¶ 17); J.A. 525–26 (¶ 35). In addition, the Union submitted two bargaining proposals, which suggests that at least some changes were communicated to the Union. J.A. 446 (¶¶ 18–20); J.A. 470–71 (Union demand to bargain over the USCP's failure to provide the names of Union employees who tested positive for COVID-19); J.A. 473–75 (USCP response); J.A. 467–68 (email exchange wherein Union Chairman requested extending the period during which a bargaining unit employee could appeal disciplinary action and the USCP agreed). Drawing all

inferences in the USCP's favor, there is sufficient evidence of notice to preclude summary judgment.

Because genuine issues of material fact preclude the grant of summary judgment, the Board erred in affirming in part the hearing officer's decision to grant summary judgment. As such, we decline to enforce the Board's order, as requested by the General Counsel and the Union. *See* Cross-Applicant's Br. 36–38; Intervenor's Br. 19.

## IV

We conclude that the Board of Directors erred in affirming in part the hearing officer's grant of summary judgment in favor of the General Counsel and the Union. Because we are reversing the grant of summary judgment and remanding for further proceedings, we need not consider the USCP's arguments regarding additional errors the Board allegedly committed in affirming the grant of the motions.

We reverse and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED**

COSTS

Costs to the USCP.